**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WILLIAM RAYMOND MILLER, II,

        Petitioner,

vs.                                Case No.:    3:12-cv-1044-J-34PDB
                                                           3:08-cr-411-J-34PDB

UNITED STATES OF AMERICA,

        Respondent.

---

## <u>ORDER</u>

This case is before the Court on Petitioner William Raymond Miller, II's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 1, Motion to Vacate)[1] and Memorandum of Law and Points of Authorities (Doc. 3, Memorandum), both filed on September 21, 2012. The United States filed a Response in Opposition on June 3, 2013. (Doc. 25, Response). Miller filed a Reply to the Government's Response on July 17, 2013. (Doc. 31, Petitioner's Reply).

Pursuant to 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and

---

[1] Citations to Miller's criminal case file, <u>United States of America v. William Raymond Miller, II</u>, 3:08-cr-411-J-34PDB, are denoted as "Crim. Doc. ___." Citations to Miller's civil § 2255 case file, 3:12-cv-1044-J-34PDB, are denoted as "Doc. ___."

[2] Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before deciding on a § 2255 motion.

determines that an evidentiary hearing is not necessary to resolve the merits of this action. See Aron v. United States, 291 F.3d 708, 714–15 (11th Cir. 2002) (indicating that an evidentiary hearing on a § 2255 petition is not required when the petitioner asserts allegations that are affirmatively contradicted by the record or patently frivolous, or if in assuming the facts that he alleges are true, he still would not be entitled to any relief); Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (concluding that a petitioner's ineffective assistance claim can be dismissed without an evidentiary hearing when the petitioner alleges facts that, even if true, would not entitle him to relief); Dickson v. Wainwright, 683 F.2d 348, 351 (11th Cir. 1982) ("On habeas a federal district court need not conduct an evidentiary hearing if it can be conclusively determined from the record that the petitioner was not denied effective assistance of counsel."); Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3]

For the reasons set forth below, Miller's Motion to Vacate, Correct, or Set Aside his sentence is due to be denied.

## I.   Background

Between 2005 and 2008, Miller issued fake surety bonds with a total face value of more than $530 million.  (Crim. Doc. 13, Plea Agreement at 23).  In the process, Miller defrauded businesses out of $22.5 million in premiums and other charges that he

---

[3]   Although the Court does not rely on unpublished opinions as precedent, they may be cited throughout this Order as persuasive authority on a particular point.  Rule 32.1 of the Federal Rules of Appellate Procedure expressly permits the Court to cite to unpublished opinions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

demanded in exchange for the fraudulent bonds.  Id.  In order to deceive and induce his victims into buying the fake bonds, Miller would sometimes misrepresent that the bonds were authorized and written by surety bond companies who are registered with the United States Treasury Department ("T-listed"), including such companies as Fidelity National Casualty and Property Insurance Company ("Fidelity National") and American Re-Insurance Company.  Id. at 20.  In other instances, Miller issued surety bonds through two other companies, First Florida Captive Holdings Corporation or AMS Capital Holdings Corporation, without claiming that the companies were "T-listed" entities.  Miller's scheme began to unravel when some of his victims attempted to make claims on the bond coverage they thought they had purchased, only to learn that the bonds Miller had issued them were worthless.

On November 20, 2008, the United States charged Miller by Information with one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2.  (Crim. Doc. 1, Information).  Miller waived indictment (Crim. Doc. 6, Crim. Doc. 11, Waivers of Indictment), and on December 11, 2008, pled guilty to both charges pursuant to a written plea agreement.  (Crim. Doc. 13, Plea Agreement).

As part of the Plea Agreement, Miller affirmed that he voluntarily pled guilty, free from coercion and without reliance on any promises or benefits other than those set forth in the Plea Agreement itself.  Id. at 15.  The Plea Agreement advised Miller that each offense charged was punishable by a maximum sentence of up to 20 years in prison, a

fine of $250,000, or both, and that the Court could also order Miller to pay restitution to his victims.  Id. at 2, 11-12.  Additionally, the Plea Agreement laid out in detail the assets Miller would forfeit to the government, including his ill-gotten gains of $22.5 million, several pieces of real property, four cars, and funds located in various bank accounts.  Id. at 6-9.  The Plea Agreement specified, however, that the assets subject to forfeiture were not limited to those listed, and that the government could pursue substitute assets if the government could not locate the listed assets.  Id. at 6, 10.  The forfeiture of assets provision contained a hand-written modification, initialed by all parties, stating "[t]he Government (USA) agree[d] to allow [Miller's] wife to remain in family home (Timber Creek Ct., Clarksville, MD) and will not force a sale; and will negotiate for her to buy out [the government's] interest."  Id. at 6.

In exchange for Miller's guilty plea, the United States Attorney's Office agreed to recommend a sentence at the low end of whatever the Court calculated Miller's advisory sentencing range to be under the United States Sentencing Guidelines ("Guidelines").  Id. at 5.  The government also agreed to recommend a two level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and to move for a third level adjustment if Miller qualified under U.S.S.G. § 3E1.1(b).  Plea Agreement at 4.  The government further agreed not to charge Miller with any other offenses of which it was then aware, and to consider whether any cooperation Miller provided would warrant further downward departures under either U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553 if

completed prior to sentencing, or under Fed. R. Crim. P. 35 if completed after sentencing. Plea Agreement at 5-6.

Miller agreed that the Plea Agreement would bind only the United States Attorney's Office for the Middle District of Florida, and not "other federal, state, or local prosecuting authorities." Id. at 14-15.  He further agreed that the Plea Agreement would not bind the Court, that the Court alone would determine his sentence, and that if the Court rejected any part of the Plea Agreement, Miller could not withdraw his guilty plea. Id. at 13.  Miller also waived the right to directly appeal or collaterally attack his sentence, unless (1) the sentence exceeded the applicable Guidelines range as determined by the Court, (2) the sentence exceeded the statutory maximum, (3) the sentence violated the Eighth Amendment to the Constitution, or (4) the government first appealed. Id. at 14.  In the Plea Agreement, Miller acknowledged that he understood the nature of the offenses to which he was pleading guilty, and that he pled guilty because he was in fact guilty. Id. at 15, 16.  Finally, Miller agreed that the Plea Agreement "constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty pleas and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea." Id. at 16.  Miller initialed each page of the Plea Agreement, including each page of the factual basis attached to it, indicating his understanding and assent. See id., generally.

Miller appeared before a United States Magistrate Judge to enter his guilty plea. (Crim. Doc. 24, Plea Tr.).  During the plea colloquy, Miller, who was under oath, assured

the Court that he understood the charges and the provisions of his Plea Agreement.  Miller and his attorney each told the Court that they had reviewed the Information filed by the government and discussed it at length.  Id. at 17.  The Court itself reviewed the Information and explained the charges, which alleged that Miller violated federal law by using interstate wire and mail communications to carry out his fraudulent bond scheme, during which he impersonated T-listed insurance companies, see id. at 19-27, and Miller assured the Court that he understood, see id. at 27.  The government advised that Miller's maximum potential sentence was 40 years in prison, a fine of up to $500,000, or both, plus the possibility of up to $500 million in restitution.  Id. at 29-30.  Miller confirmed that he understood this as well.  Id. at 30-31.  The Court also reviewed with Miller each of the 23 specific assets listed in the Information's forfeiture provision, which mirrored those listed in the Plea Agreement.  See Plea Tr. at 31-33; compare Information at 8-10 with Plea Agreement at 6-9, and Miller stated that he understood the forfeiture provision as well, see Plea Tr. at 34.

During the plea colloquy, the Court explained to Miller the rights that he would give up by pleading guilty, including any defenses to his conduct, and Miller stated that he understood that waiver.  Id. at 58-64.  The Court then discussed with him the provision of the Plea Agreement by which he waived the right to directly appeal or collaterally challenge his sentence.  Id. at 64.  After Miller expressed some concern about being unable to appeal if he received the maximum potential sentence, the Court assured Miller that he was free to take additional time to consider the waiver if he needed it.  Id. at 64-

66, 70.  However, Miller assured the Court that he was prepared to proceed.  The Court also reviewed the appeal waiver, explaining that pursuant to the Plea Agreement, Miller waived the right to directly appeal or collaterally attack his sentence, subject to the limited exceptions listed in the agreement.  Id. at 71.  In doing so, the Court explained what it meant to collaterally attack a sentence under § 2255.  Id. at 73-74.  Miller stated that he understood his rights to directly appeal or collaterally attack his sentence, and that he knowingly and voluntarily waived them.  Id. at 71-75.

Before completing the plea colloquy, Miller assured the Court that he had been given plenty of time to review the charges against him, to talk to his lawyers (of which he had four), and that he was satisfied with his legal representation.  Id. at 75-76.  After the Court reviewed the forfeiture provision in the Plea Agreement a second time, Miller confirmed that he understood it and accepted it knowingly and freely.  Id. at 84-88.  Miller then confirmed that he was pleading guilty to both counts because he was in fact guilty, and further admitted the truth of the charges after the government read the factual basis.  Id. at 98-105.  Miller also acknowledged his guilt after the Court read the elements of the offenses, including that he used FedEx and a telephone communication to further his scheme to defraud.  Id. at 105-10.

Importantly, Miller affirmed that nobody had coerced him to plead guilty.  Id. at 112.  Miller declared under oath that nothing had been said to him or his attorney that caused him to plead guilty, other than what appeared in the Plea Agreement.  Id.  Miller confirmed that he had read the Plea Agreement in its entirety and discussed it with his lawyer, and

7

that it was his own independent decision to enter into it.  Id. at 113.  Miller stated that no one had threatened, forced, coerced, or intimidated him into accepting the terms of the Plea Agreement, and that he did so voluntarily.  Id. at 114.  Miller also told the Court that nobody made him any promises other than those contained in the Plea Agreement.  Id. Lastly, Miller, his counsel, and the government told the Court that no agreement, promise, or understanding had been made to Miller other than what had been stated on the record. Id. at 115.

At the conclusion of the plea colloquy, the Court found that Miller pled guilty knowingly and freely, aware of both his rights and the consequences of pleading guilty. Id. at 116-17.  Miller agreed with the Court's findings.  Id. at 117.  The magistrate judge forwarded a report recommending that the Court accept Miller's guilty plea pursuant to the Plea Agreement, which the Court accepted and adopted.  (Crim. Doc. 18, Report and Recommendation; Crim. Doc. 26, Acceptance of Guilty Plea).

At sentencing, the Court calculated Miller's guidelines range to be 97 to121 months in prison.  (Crim. Doc. 79, Sentencing Tr. I at 25).  The Court sentenced Miller to concurrent terms of 121 months in prison for each charge, explaining that Miller had participated in fraudulent schemes throughout the country since 1992, brazenly continued his criminal conduct after law enforcement confronted him, and had committed fraud in Maryland for which he never paid restitution.  (Crim. Doc. 80, Sentencing Tr. II at 46-56). Following a separate hearing, the Court ordered Miller to pay $3.2 million in restitution to the victims of his crimes.  (Crim. Doc. 127, Amended Judgment).

After his sentencing, Miller filed two pro se motions to withdraw and to vacate his guilty plea, making various arguments that his sentence was erroneous and that the government had breached his Plea Agreement.  This Court struck the motions without considering them on the merits because the Court did not have authority under the Federal Rules of Criminal Procedure to grant vacatur of a guilty plea after sentencing. (Crim. Doc. 178, Order).  Miller appealed and the Eleventh Circuit affirmed the Court's denial of Miller's pro se motions.  United States v. Miller, 432 F. App'x 952 (11th Cir. 2011) ("Miller I").  Noting that Miller did not express a desire to withdraw his guilty plea until after the Court had already sentenced him, the Eleventh Circuit affirmed this Court's finding that it lacked jurisdiction to grant a vacatur or withdrawal of Miller's guilty plea.  Miller I, 432 F. App'x at 954.  Many of the claims that were the subject of those pro se motions are now the subject of the instant § 2255 motion.

Miller, with the assistance of counsel, also appealed his conviction and sentence to the Eleventh Circuit Court of Appeals, both of which the court affirmed in a separate opinion.  United States v. Miller, 432 F. App'x 955 (11th Cir. 2011) ("Miller II").  Miller raised five issues: (1) that the government failed to recommend a sentence at the low end of his guidelines range, in violation of a provision of his Plea Agreement; (2) that the Court's order directing him to pay restitution violated his Plea Agreement; (3) that his sentence was based on false and erroneous testimony; (4) that the Court incorrectly calculated the loss amount caused by his fraud, resulting in "unfair and unreasonable" punishment; and (5) that the Court erroneously struck a Rule 35(a) motion that Miller had

9

filed seeking a reduced sentence.  Id. at 957.  The court of appeals rejected Miller's contentions that the government's statements at the sentencing hearing, his sentence at the high end of the guidelines range, or the Court's restitution order breached the Plea Agreement.  Id. at 959-60.  The court also found that Miller entered into a valid sentence-appeal waiver, that his sentencing challenges were barred, and that his sentence did not violate the Eighth Amendment.  Id. at 960-61.  Finally, the court of appeals affirmed the Court's decision to strike Miller's pro se Rule 35(a) motion.  Id. at 961.

After the Eleventh Circuit ruled, Miller requested a rehearing, which the Eleventh Circuit denied on August 22, 2011.  Miller did not request certiorari review by the Supreme Court.  Therefore, Miller's conviction and sentence became final on November 20, 2011, upon the expiration of the 90-day period for filing a petition for a writ of certiorari. Kaufmann v. United States, 282 F.3d 1336, 1338 (11th Cir. 2002).  Miller had one year from that date, or until November 20, 2012, to file a motion to vacate under 28 U.S.C. § 2255(f)(1).  Miller filed his Motion to Vacate on September 21, 2012, and his Motion is therefore timely.

## II.    Miller's Motion to Vacate

Miller raises eight grounds for relief in his Motion to Vacate: (1) counsel rendered ineffective assistance by failing to communicate a plea offer; (2) counsel rendered ineffective assistance by negotiating a "faulty and erroneous" plea agreement; (3) counsel rendered ineffective assistance at sentencing; (4) counsel rendered ineffective assistance by failing to hire experts to properly investigate his case; (5) the government breached

the Plea Agreement in various ways; (6) the government lied or committed fraud on the Court, including by providing false testimony at the sentencing hearing; (7) there was a conflict of interest within the United States Attorney's Office; and (8) the Court lacked jurisdiction to convict and sentence him. Memorandum at 2. The Court will address each ground in turn.[4]

### III.    Opinion

Pursuant to Title 28, United States Code, Section 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits such collateral challenges on four specific grounds: (1) the imposed sentence was in violation of the Constitution or laws of the United States; (2) the court did not have jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C §2255(a) (2008). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184-86 (1979). A petitioner's challenge to his sentence based on a Sixth Amendment claim of ineffective

---

[4]       Miller's Motion to Vacate and supporting Memorandum totaled over 110 pages, with facts related to some of the legal arguments scattered across different sections. Occasionally, facts that were more relevant to one ground were alleged in a section on a different ground. The Court has attempted to organize the Order to best address each of the arguments Miller has raised. Additionally, Miller makes a few conclusory arguments in his Motion to Vacate that he does not adequately address in his Memorandum. Conclusory arguments, unsupported by specifics, do not warrant an evidentiary hearing. Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir.1991) ("A petitioner is not entitled to an evidentiary hearing… when his claims are merely conclusory allegations unsupported by specifics...") (emphasis in original) (internal citations and quotations omitted). Accordingly, the Court focuses on those grounds which Miller properly pursues.

assistance of counsel is normally considered in a collateral attack.   United States v. Teague, 953 F.2d 1525, 1534 n. 11 (11th Cir. 1992).

As noted, Miller waived his right to direct and collateral review as part of his Plea Agreement, with limited exceptions not applicable here.   See Plea Agreement at 14.   A petitioner's right to directly or collaterally challenge his sentence may be barred if he effectively waived that right pursuant to a plea agreement.   Williams v. United States, 396 F.3d 1340, 1341-42 (11th Cir. 2005), cert. denied, 546 U.S. 902 (2005) (holding that petitioner's valid sentence-appeal waiver made pursuant to a plea agreement precluded him from collaterally attacking his sentence later on a claim of ineffective assistance of counsel during sentencing).   Nevertheless, a sentence-appeal waiver will not bar certain ineffective assistance of counsel claims from being considered pursuant to § 2255.   When a petitioner alleges that the ineffective assistance of counsel undermines the validity or voluntariness of the plea or waiver itself, such as a claim that counsel coerced or misadvised petitioner prior to entry of the plea, then the sentence-appeal waiver will not bar a court from hearing the claim on the merits.   See Baird v. United States, 445 F. App'x 252, 254 (11th Cir. 2011) (per curiam) (noting that despite a sentence-appeal waiver, collateral attack through an ineffective assistance claim is permitted when "the movant challenges the knowing and voluntary nature of the plea")[5]; see also Cowart v. United

---

[5]        In Baird, the Eleventh Circuit addressed the merits of the petitioner's ineffective assistance claim challenging the validity of both his plea and sentence-appeal waiver.   See Baird, 445 F. App'x at 253-54. The petitioner alleged that he unknowingly and involuntarily entered a guilty plea due to his counsel's failure to properly explain to him the terms of his waiver in his plea agreement.   Id.   The court held that the petitioner was not entitled to relief because he did not show sufficient prejudice, namely, that there was a reasonable probability he would not have pleaded guilty if counsel had explained the terms of the waiver.   Id. (finding

States, 139 F. App'x 206, 207-08 (11th Cir. 2005) (per curiam) (holding that a sentence-appeal waiver that only expressly limits a petitioner from collaterally challenging his "sentence" does not bar an ineffective assistance claim that challenges the validity of his plea or the sentence-appeal waiver itself). Therefore, despite the presence of a sentence-appeal waiver, the Court will address the merits of a § 2255 petitioner's claim of ineffective assistance if it challenges the validity of the plea or waiver. Id.

Additionally, challenges to a court's subject matter jurisdiction survive a sentence-appeal waiver. Both the United States Supreme Court and the Eleventh Circuit Court of Appeals have explicitly recognized that challenges to a court's subject matter jurisdiction cannot be waived, forfeited, or procedurally barred. United States v. Cotton, 535 U.S. 625, 630 (2002) (stating that subject matter jurisdiction can never be forfeited or waived because it involves a court's power to hear a case); United States v. Peter, 310 F.3d 709, 712 (11th Cir. 2002) (jurisdictional error "can never be waived by parties to litigation").

The Eleventh Circuit Court of Appeals has previously determined that Miller entered into a valid sentence-appeal waiver. Miller II, 432 F. App'x at 960. Thus, the Court will not revisit the validity of that waiver. Because the Court does not find that the government has breached the Plea Agreement for the reasons stated below, Miller's waiver of the right to collaterally challenge his sentence has continued force here. However, because some of Miller's claims challenge the validity of his guilty plea or the Court's subject-matter jurisdiction, the Court will review those claims on the merits.

---

that the petitioner's decision to plead guilty was primarily driven by the government's agreement not to forfeit his property, and that counsel's explanation of the waiver would not have deterred his plea.).

## A.  Grounds one through four: ineffective assistance of counsel

As with any Sixth Amendment ineffective assistance of counsel claim, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that his counsel's deficient performance sufficiently prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994).  In determining whether the petitioner has satisfied the first requirement, i.e. that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance.  Weeks, 26 F.3d at 1036.  The petitioner must show, in light of all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance."  Id.  To satisfy the second requirement, i.e. that counsel's deficient performance prejudiced the defendant, the petitioner must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  Id. at 1036-37 (citing Strickland, 466 U.S. at 694).  In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence.  Strickland, 466 U.S. at 695.  However, because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  Id. at 697; see also Wellington v. Moore, 314 F.3d 1256, 1261 n. 1 (11th Cir. 2002) ("We need not discuss the performance deficiency component of [petitioner's]

14

ineffective assistance claim because failure to satisfy the prejudice component is dispositive.").

To succeed on a claim that a guilty plea made pursuant to a plea agreement was obtained as the result of the ineffective assistance of counsel, a § 2255 movant must show that trial counsel's advice "fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 57, 59 (1985) (citations omitted).

### 1. Ground One: Failure to communicate plea offer

Miller's first claim is that counsel failed to communicate a plea offer, thereby rendering ineffective assistance under Missouri v. Frye, 132 S. Ct. 1399 (2012). Specifically, Miller contends that the government made two plea offers – the one he received, plus a previous one about which counsel failed to inform him.  In support of this contention, Miller points to an email dated Wednesday, July 16, 2008, from prosecutor Russell Stoddard to defense counsel Danny Onorato which reads:

> Danny, I'm putting the final touches on the information and plea agreement.
> I will have these for you no later than Friday.

("Appx 1" to Motion to Vacate).  A month and a half later, on September 2, 2008, the prosecutor mailed the plea offer that Miller ultimately accepted to another one of Miller's attorneys, Mark MacDougall.  (See Doc. 25-10, Cover Letter to Plea Offer).  Based on this sequence of events, Miller argues that there were two separate plea offers – one in July 2008 and another one in September 2008.  In response, the United States asserts

15

that while plea negotiations were under way in July 2008, these negotiations culminated only in a single plea offer – the same one Miller ultimately accepted.  Response at 10.

Miller infers too much from the July 2008 email.  This single email, even when combined with the fact that a plea offer was sent to a different lawyer more than a month after the "Friday" as promised, is simply insufficient to support the claim that the government made an earlier plea offer which Miller's attorneys failed to communicate. The existence of plea negotiations with attorney Onorato in July 2008 is entirely consistent with the government's submission of a proposed plea agreement to attorney MacDougall on September 2, 2008, especially taking into account ordinary business delays.  Indeed, the cover letter itself to the government's plea offer, dated September 2, 2008, referred MacDougall to the enclosed "original" copies of the Plea Agreement and Waiver of Indictment.  (Doc. 25-10, Cover Letter to Plea Offer).  Moreover, the fact that the prosecutor told Onorato that he intended to forward a finalized plea agreement on Friday, July 18, 2008, does not mean he actually did so.  Indeed, despite having obtained his entire case file from his prior attorney, Miller provides no evidentiary support for his contention that the prosecutor actually forwarded a plea offer to his lawyer in July or at any time other than September 2008.  See Memorandum at 7; see also exhibits attached to Motion to Vacate.  Accordingly, the July 2008 email offers little support for a finding that the United States made two separate plea offers and that Miller's lawyers failed to communicate one of them.  Absent any evidence that the government actually made two

different offers, Miller has not demonstrated that counsel performed deficiently by failing to communicate a prior plea offer.  Miller's allegation is bare conjecture.

Additionally, even if the prosecutor did forward a plea offer to Onorato in July 2008, Miller points to no evidence indicating that the terms of that offer were any different from the terms which Miller ultimately accepted.  Because there is no indication that such a prior offer contained different or more favorable terms, Miller has not demonstrated prejudice.  See Lafler v. Cooper, 132 S. Ct. 1376, 1385 (2012) ("In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability…that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.").

"A petitioner is not entitled to an evidentiary hearing… when his claims are merely conclusory allegations unsupported by specifics..."  Tejada, 941 F.2d at 1559 (emphasis in original) (internal citations and quotations omitted).  Moreover, a district court need not hold an evidentiary hearing if the petitioner's allegations are "patently frivolous," "based on unsupported generalizations," or "affirmatively contradicted by the record."  Holmes v. United States, 876 F.2d 1545, 1552 (11th Cir. 1989).  Miller's contention that his counsel failed to communicate a prior plea offer to him, based only on an inference drawn from the July 16, 2008 email, is speculative at best.  Therefore, no evidentiary hearing is warranted and the claim is due to be denied.

17

### 2.  Ground Two: Negotiating a "faulty and erroneous plea agreement"

Miller contends that counsel rendered ineffective assistance with regard to his Plea Agreement because (1) the Plea Agreement contained factual errors and counsel misrepresented the terms of the agreement to him; (2) counsel failed to advise him that he could withdraw his guilty plea; (3) counsel failed to memorialize certain promises in the Plea Agreement; (4) the Plea Agreement did not benefit him, and (5) counsel should have advised him of the option to enter an open plea.   Motion to Vacate at 7; Memorandum at 7-10.

### a.  Errors of material facts and misrepresentations concerning the Plea Agreement

Miller is vague about what errors of material facts found their way into the Plea Agreement, or how the alleged factual errors prejudiced him.[6]  Miller is also vague about how counsel misrepresented or inadequately explained the terms of the Plea Agreement. Indeed, the only misrepresentation Miller identifies with specificity is that counsel allegedly told him "that the plea agreement was limited to the T-listed fraud."[7]  Id. at 8.

---

[6]     Miller does state that "false information" in the Plea Agreement caused him to "ple[a]d to something he didn't do – and every stage of the 'criminal process' that followed suit based on flawed document [sic] was also based on incorrect information."  Memorandum at 8.  The contention that "false information" in the Plea Agreement caused him to plead guilty "to something he didn't do" is entirely inconsistent with Miller's sworn statements during his plea colloquy that he reviewed the factual basis and the charges, and admitted their truth.

[7]     It is not clear what Miller means when he claims his attorney misrepresented that the scope of his Plea Agreement was "limited to" the fraud of T-listed companies.  Miller pled guilty to two counts, both of which were, in fact, based on Miller's fraud in issuing fake surety bonds in the name of Fidelity National – a T-listed surety bonder.  See Plea Agreement at 22-23.  In that respect, there was no "misrepresentation" if counsel told Miller that his Plea Agreement was "limited to" the fraud of T-listed companies.  If Miller means that his counsel misrepresented that his restitution or sentencing liability was limited to fraud involving T-listed companies, that belief should have been dispelled by the Plea Agreement and the plea colloquy for reasons discussed below.

18

Miller alleges that he would not have pled guilty had he understood he could be held accountable for the fraudulent bonds he issued in the name of non-T-listed surety bond companies.  Id. at 12.  It is unclear whether Miller is referring to his accountability for restitution as to the fraud related to non-T-listed companies or the inclusion of bonds issued in the names of non-T-listed sureties in determining his offense level under the Guidelines.  In an abundance of caution the Court will address both.

In determining whether a guilty plea was knowing and voluntary, the essential considerations are whether (1) the guilty plea was made free from coercion; (2) the defendant understood the nature of the charges; and (3) the defendant knew and understood the consequences of his guilty plea.  United States v. Mosley, 173 F.3d 1318, 1322 (11th Cir.1999).  The record before the Court conclusively shows that each of these considerations is satisfied.

First, the record refutes Miller's allegation that his attorney allowed factual errors to slip into the Plea Agreement.  Miller told the Court, under oath, during the plea hearing that he had reviewed the charges, the factual basis of his guilty plea, and the Plea Agreement in its entirety, and that he understood and accepted them.  Plea Tr. at 17, 27, 100-10, 112-13.  In addition, the Court reviewed the charges, penalties, factual basis, waivers, and other terms of the Plea Agreement with Miller, and Miller stated under oath that he understood each.  Id. at 19-31, 71-75, 58-98, 99-110.  Miller further assured the Court that he voluntarily accepted the terms of the Plea Agreement, free from coercion or threats.  Id. at 112-14.  Miller's conduct as it pertained to both T-listed and non-T-listed

companies was specifically included in the factual basis.  Plea Agreement at 20-23.  Miller admitted the truth of the factual basis after hearing it read to him, and confirmed before the Court that he had in fact committed the acts alleged in the Information.  Plea Tr. at 99-110.  If there were any factual errors in the Plea Agreement, Information, or factual basis, Miller both fails to identify them and to explain why he told the Court, under oath, that the charges and the factual basis were true and that he understood the various provisions of his Plea Agreement when questioned about each one.

The record also refutes Miller's contention that he pled guilty as a result of false representations about his potential liability for restitution.  Notably, the Court informed Miller at the plea hearing that his restitution liability could exceed $500 million – the cumulative face value of all of the fraudulent bonds he issued – and Miller stated that he understood.  Plea Tr. at 29-31.  Miller's maximum potential restitution liability could not possibly have reached that amount if he truly believed that his liability under the Plea Agreement was limited only to fraud involving T-listed surety bond companies, because as Miller himself has stated, "[t]he 'T-listed' bonds represented a very small percentage" of his fraud.  Memorandum at 11.  Miller nevertheless pled guilty after affirming in open court that he understood his maximum potential restitution liability could exceed $500 million.[8]

---

[8]      Although the two criminal charges to which Miller pled guilty involved T-listed surety bonders, the Court's statutory authority to order restitution to victims of uncharged conduct is well-established where the uncharged conduct is part of the same scheme, conspiracy, or pattern of criminal activity.  United States v. Brown, 665 F.3d 1239, 1252 (11th Cir. 2011); see also United States v. Valladares, 544 F.3d 1257, 1268-70 (11th Cir. 2008).  As Miller's conduct in issuing fake surety bonds in the name of non-T-listed companies was part of the same scheme to which he pled guilty, the Court had authority to order restitution to the victims who received fake surety bonds in the name of both T-listed and non-T-listed companies.

With regard to the calculation of his sentencing guidelines, Miller has not shown that he pled guilty relying on the belief that the Court would not consider his conduct involving bonds issued in the name of non-T-listed companies, or that he believed he was assured any sort of lenience in sentencing.  To the contrary, Miller's Plea Agreement specifically stated the following under a section titled "Sentencing Information":

> The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Plea Agreement at 12 (emphasis added).  During his plea hearing, the government informed Miller that he faced a maximum sentence of up to 40 years in prison, and Miller confirmed he understood that.  Plea Tr. at 29-31.  Miller also told the Court that he had discussed the Sentencing Guidelines with his attorney.  Id. at 89.  The Court warned Miller that nobody could predict his sentence or what his Guidelines range would be until his presentence report ("PSR") was prepared, and even then that the Court could vary

---

Similarly, the Court did not err in calculating the loss amount from Miller's fraud, for purposes of U.S.S.G. § 2B1.1, based on uncharged conduct involving fake surety bonds issued in the name of non-T-listed companies.  United States v. Foley, 508 F.3d 627, 633 (11th Cir. 2007) (quoting United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006)) ("[I]n calculating the amount of loss, the Guidelines require a district court to take into account 'not merely the charged conduct, but rather all "relevant conduct," in calculating a defendant's offense level.'").

upward from the Guidelines.  Id. at 89-91.  Additionally, the Court advised Miller that he

could not count on the sentencing estimates of his attorney:

> THE COURT:  So you understand that anything your lawyer or anyone else had told you about the guideline application to your case is only an estimate and that, if incorrect, it will not be grounds for allowing you to withdraw your guilty plea?
>
> THE DEFENDANT: Oh yes, I understand that.

Id. at 90.  Miller also told the Court that he did not plead guilty depending on any off-the-

record promises or agreements.  Id. at 114.  Thus, not only had the Court notified Miller

that his sentence could be as high as 40 years, but he pled guilty knowing that uncharged

criminal conduct could influence his sentence, and that nobody could predict precisely

what the ultimate sentence would be.   The Court sentenced Miller to a term of

imprisonment of 10 years and one month – well within the range of possible sentences

he knew he could receive.

Under these circumstances, Miller has not shown that he pled guilty under a false

impression about his potential restitution or sentencing exposure, even if his attorney did

not advise him that his fraud involving the non-T-listed companies could affect his

penalties.   Miller's own signed Plea Agreement notified him that "criminal activities"

outside of what he pled guilty to could affect his sentence.   The Court's extensive

discussion made clear that his sentence was unpredictable, could be as high as 40 years,

and could include restitution up to the $500 million face value of all the fraudulent bonds

he issued, yet Miller still pled guilty.

When a court accurately advises a defendant at a plea colloquy of the terms of a plea agreement and the hazards of sentencing, and the defendant still decides to proceed, the court's advice cures the effect of inconsistent advice by defense counsel. See e.g., United States v. Wilson, 245 F. App'x 10, 12 (11th Cir. 2007) ("During the plea colloquy, the district court itself explained to Wilson – in detail – the consequences of the plea agreement, range of punishment, and sentencing contingencies before accepting Wilson's guilty plea.  Thus, any failure on the part of Wilson's counsel to clearly explain the possible punishment was cured by the district court."); Gambrel v. United States, 2013 WL 3934205 at *11 (S.D. Ga. July 30, 2013) ("So long as the Rule 11 court correctly advises a defendant of the minimum and maximum penalties he faces as a result of pleading guilty, a petitioner fails to establish prejudice by alleging that counsel gave erroneous advice about the sentence he might receive or the possibility for enhancements under the Sentencing Guidelines."); United States v. Shedrick, 493 F.3d 292, 299 (3d Cir. 2007) (affirming denial of § 2255 claim that counsel was ineffective for failing to advise petitioner of "the potential for enhancement or upward departure" where such failure was "corrected by the written plea agreement and the detailed in-court plea colloquy, both of which accurately stated [petitioner's] potential sentence.").  Because the Court exhaustively discussed with Miller nearly every aspect of his decision to plead guilty – including not only the operation of the Sentencing Guidelines and his potential punishment, but also his waiver of certain rights and the fact that the Court was free to reject sentencing recommendations without Miller being allowed to withdraw his plea –

and Miller consistently stated that he understood, Miller has not shown that he would not have pled guilty but for the allegedly erroneous advice regarding the non-T-listed companies.   Therefore, even assuming the truth of Miller's allegation that counsel misrepresented the terms of the Plea Agreement, Miller's claim fails to satisfy <u>Strickland</u>'s prejudice prong in light of his decision to plead guilty following the Court's thorough plea colloquy.

Moreover, "the representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." <u>Blackledge v. Allison</u>, 431 U.S. 63, 73–74 (1977).   Indeed, "[t]he subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." <u>Id.</u> at 74.   Miller made sworn declarations to the Court that he understood the charges, the possible penalties, the Plea Agreement, and that he admitted the truth of the factual basis even after the Court independently reviewed these matters with him.   Miller's claims that factual errors and misrepresentations caused his guilty plea to be unintelligent are incredible in light of his sworn statements during the plea colloquy.   After review of the record, the Court readily concludes that Miller has not produced evidence to rebut the strong presumption that his guilty plea was an intelligent choice and that his sworn declarations at the plea colloquy were true.

### b. Counsel's alleged failure to advise Miller that he could withdraw his guilty plea

The record similarly establishes the absence of prejudice with regard to counsel's alleged failure to advise Miller that he could withdraw his guilty plea.  Miller states that he had "reservations" about pleading guilty, and his attorneys rendered ineffective assistance by failing to inform him that he could attempt to withdraw his guilty plea before sentencing.  Memorandum at 10.

During Miller's plea hearing, the Court patiently explained to him that he did not have to proceed with his guilty plea if he did not want to, but Miller told the Court that he wanted to proceed.  Plea Tr. at 64-70.  Having pled guilty after an exhaustively thorough colloquy, Miller would have faced a formidable barrier if he sought to withdraw his guilty plea.  Had Miller attempted to do so, the Court would have considered whether (1) Miller had the close assistance of counsel, (2) the plea was knowing and voluntary, (3) judicial resources would be conserved, and (4) the government would be unduly prejudiced.  United States v. Buckles, 843 F.2d 469, 471-72 (11th Cir. 1988).  The Eleventh Circuit has instructed that the first two factors are the most significant.  See United States v. Gonzalez-Mercado, 808 F.2d 796, 801 (11th Cir. 1987).  Because the record establishes that Miller pled guilty following a proper and complete Rule 11 colloquy where he assured the Court under oath that it was his own free decision to plead guilty, he enjoyed the close assistance of counsel (actually four attorneys), and he displayed a clear understanding of the consequences of his plea, he has shown no possibility that a motion to withdraw his plea would have been granted.  Indeed, Miller points to no evidence in the record that

would have supported a withdrawal of his guilty plea. As such, Miller did not suffer prejudice from his attorneys' failure to advise him about the possibility of withdrawing his guilty plea.

### c. Counsel's alleged failure to memorialize certain promises in the Plea Agreement

The record also conclusively refutes Miller's claim that counsel failed to memorialize in the Plea Agreement certain promises made by the government. Miller stated under oath that nothing had been said to him or his attorneys that caused him to plead guilty other than what appeared in the Plea Agreement. Id. at 112. The Court also asked Miller whether he pled guilty based on any promises other than those contained in the Plea Agreement itself, see id. at 114, and Miller said no. Id. In addition, Miller and his attorney told the Court that there were no understandings, promises, or agreements between himself, his attorneys, or the government other than what was stated on the record. Id. at 115. Thus, Miller's sworn affirmations that there were no agreements or promises other than those in the Plea Agreement refute his claim that counsel failed to memorialize certain promises in the agreement. Even if counsel did fail to include certain promises in the agreement, Miller's sworn declarations that he did not plead guilty in reliance on any off-the-record promises would preclude a finding of prejudice as well.

### d. Counsel's alleged failure to negotiate a more favorable plea agreement

Miller's contention that counsel rendered ineffective assistance because the Plea Agreement was not favorable to him lacks merit. The fact that, in hindsight, Miller believes

26

he did not get "enough" simply provides no basis for habeas relief.  Undoubtedly, the right to the effective assistance of counsel extends to the plea bargaining process.  See Cooper, 132 S. Ct. at 1384.  The Supreme Court has found that an attorney performed deficiently in plea-bargaining where his representation deprived the defendant of the ability to make an intelligent choice, such as where counsel altogether failed to communicate a plea offer to his client, Frye, 132 S. Ct. at 1408, or where counsel advised his client to reject a plea offer based on patently incorrect legal advice, Cooper, 132 S. Ct. at 1383 (counsel told defendant that because he shot victim below the waist, prosecution would not be able to prove he committed assault with intent to murder).  However, Miller points to no authority establishing that counsel performs deficiently in the plea bargaining process simply because, in hindsight, the terms of the bargain were not as good as some hypothetical alternative.  To the contrary, the Supreme Court has cautioned (1) that "[t]he object of an ineffectiveness claim is not to grade counsel's performance[,]" Strickland, 466 U.S. at 697, and (2) that in considering such a claim, courts must eliminate the distorting effects of hindsight and evaluate counsel's choices "as of the time of counsel's conduct."  Id. at 690.  As such, the Supreme Court has emphasized that the need for deference to defense counsel's judgment is especially acute in the plea bargaining context.  Premo v. Moore, 131 S. Ct. 733, 741 (2011) ("The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision.").

Nevertheless, even if his claim is considered on the merits, the record refutes it. The record reflects that counsel negotiated a number of benefits for Miller under the Plea Agreement.  First, the government agreed to recommend a sentence at the low end of his Guidelines range as calculated by the Court.  Plea Agreement at 5.  Second, the government agreed to recommend a two-offense-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), plus an additional offense level reduction under U.S.S.G. § 3E1.1(b) if Miller qualified.  Plea Agreement at 4.  Third, the government agreed to bring no further charges against Miller based on any criminal conduct of which it was then aware.  Id. at 3. Finally, the government agreed to consider any substantial assistance Miller was able to offer.  Id. at 5-6.

The Court will not invalidate a plea agreement simply because, in retrospect, a petitioner is disappointed that his attorney did not extract even more favorable concessions from the government.  As the Seventh Circuit has explained, "[t]o allow an otherwise valid plea agreement to be undone because the defendant did not obtain 'enough' of a benefit would undermine the efficacy of such agreements by permitting the defendant to obtain the benefit of the bargain without suffering the detriment."  United States v. Williams, 184 F.3d 666, 670 (7th Cir. 1999).  "This 'is the one outcome that would be most destructive of the plea agreement process' as '[d]efendants must take the bitter with the sweet.'"  Id. (quoting United States v. Wenger, 58 F.3d 280, 283 (7th Cir. 1995)).  Nearly every defendant could complain that counsel could have negotiated even better terms, but if every such plea agreement were invalidated it would eviscerate the

utility of the plea system.  Accordingly, the Court declines Miller's invitation to revisit the substance of his plea agreement and speculate about whether counsel could have gotten more.   Miller told the Court, under oath, that he understood the terms of his Plea Agreement, the consequences of pleading guilty, as well as the penalties and forfeitures he faced, that he was satisfied with his attorneys, and then proceeded to plead guilty. Miller knowingly and voluntarily accepted the plea offer, and the Court will not entertain his complaints now because he has buyer's remorse.[9]

### e.  Failing to advise Miller of the option to enter an open plea

Miller also alleges that he was worse off under the Plea Agreement than if he had gone to trial, and that his attorney rendered ineffective assistance by failing to advise him that he could enter an open plea, i.e. a guilty plea without a plea agreement. Memorandum at 8.

Where a petitioner alleges that counsel performed deficiently by not advising him of the option to enter into an open plea, the petitioner must show a reasonable probability that he would have actually taken advantage of that option.  Cf. Frye, 132 S. Ct. at 1409 (for a petitioner to establish prejudice from an attorney's failure to communicate an expired plea offer, he must show a reasonable probability that he would have actually accepted the offer).  If a petitioner would not have entered an open plea anyway, however, he cannot show that he suffered prejudice from not being informed of the choice.  Here, Miller has not demonstrated the necessary prejudice.

---

[9]     Notably, Miller points to no evidence supporting a conclusion that his counsel or any attorney could have obtained an agreement by the government to a plea under more favorable terms.

Even assuming that counsel failed to advise Miller of the option to plead guilty without a plea agreement, Miller has not shown a reasonable probability that he would have actually done so.  Significantly, Miller does not even allege that he would have entered a guilty plea without a plea agreement.  Instead, he simply complains that counsel failed to advise him of the option.  Moreover, he fails to suggest how such a course of action would have been more favorable for him.  To the contrary, as discussed above, the record reflects that by pleading guilty pursuant to the Plea Agreement, Miller obtained a variety of benefits, including the government's agreement to negotiate for Miller's wife to keep the family home.  Elsewhere in his Motion to Vacate, Miller himself acknowledges that the government's agreement to not force a forfeiture of the family home was a major incentive for him to accept the Plea Agreement.  <u>See</u> Memorandum at 15-19.  On this record, Miller has failed to show a reasonable probability that he would have pled guilty without any of the benefits of a plea agreement had he been given the option.

### 3.   Ground Three:  Ineffective assistance at sentencing[10]

---

[10]      All of the claims raised in this ground are also barred by Miller's sentence-appeal waiver, which the Eleventh Circuit has already held to be valid.  <u>Miller II</u>, 432 F. App'x at 960.  A valid sentence-appeal waiver can preclude a petitioner from collaterally attacking his sentence, including collaterally attacking the sentence based on the ineffective assistance of counsel.  <u>Williams</u>, 396 F.3d at 1341-42.  Miller's waiver of collateral review explicitly covers attacks on his sentence.  Plea Agreement at 14.  Now, Miller aims to challenge his sentence by raising claims of ineffective assistance of counsel at sentencing.  <u>See</u> Memorandum at 10-13.  Therefore, these claims are squarely within the scope of Miller's waiver of collateral review, and could be dismissed as barred by his Plea Agreement.
      However, the Court declines to rely exclusively on the sentence-appeal waiver in light of the policy announced by the Department of Justice on October 14, 2014, directing federal prosecutors to no longer enforce appeal waivers against claims of ineffective assistance of counsel.  <u>See</u> http://pub.bna.com/cl/DOJwaiverpolicy.pdf.  Although the government in this case has not revoked its reliance on Miller's sentence-appeal waiver, the Court in an abundance of caution will address the claim on the merits.

Miller contends that counsel provided ineffective assistance at sentencing. Specifically, he claims that his attorneys abandoned him because they were allegedly laboring under a conflict of interest after Miller was no longer able to pay them.  As a result, Miller contends that his attorneys failed to argue for mitigation of the loss amount; failed to "investigate and take action to assure that factually accurate information was presented to the court"; failed to raise alleged breaches of the Plea Agreement; and failed to advise him on how to terminate the attorney-client relationship so that Miller could represent himself.  See Memorandum at 10-13, 50-57.

To show a denial of the right to the effective assistance of counsel based on an alleged conflict of interest, a petitioner must show that (1) his counsel labored under an actual conflict of interest, and (2) that this conflict "actually affected" counsel's performance.  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980); Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001).  Miller fails on the second prong, because the record reflects that counsel zealously advocated on Miller's behalf.

A team of three lawyers represented Miller at sentencing.  Miller's attorneys submitted a 28-page sentencing memorandum in which counsel argued that a three-year sentence was appropriate for Miller.  (Crim. Doc. 55, Sentencing Memorandum at 25).  In support, counsel objected to the application of the abuse-of-trust enhancement under U.S.S.G. § 3B1.3, which had been included in the presentence report.  Counsel for Miller capably argued the issue and the Court ultimately sustained the objection.  See Sentencing Tr. I at 7-24.  Counsel's success in eliminating the two-level abuse-of-trust

enhancement alone reduced Miller's Guidelines range from 121 to 151 months in prison (2009 Guidelines range for criminal history category I, offense level 32) to 97 to 121 months in prison (the range for criminal history category I, offense level 30).   Counsel further urged the Court to sentence Miller below his Guidelines range, arguing that a sentence within the Guidelines range would be disproportionate relative to the sentences given similarly situated defendants.  In support of that argument, counsel identified and discussed 14 cases where fraud defendants received sentences below Miller's Guidelines range.   Sentencing Memorandum at 7-10.   Counsel also attempted to argue that, considering the nature and circumstances of Miller's offense under 18 U.S.C. § 3553(a)(1), Miller deserved a sentence well below his advisory Guidelines range because he did not abscond with all of the money he had fraudulently obtained.  Rather, counsel identified five instances where Miller returned the bond premiums of purchasers whose surety bonds were rejected, three instances where Miller paid claims, and other ways in which Miller attempted to run his surety bond companies like legitimate businesses, such as by hiring actuaries and requiring his clients' subcontractors also to be surety-bonded to reduce the risk of loss.  Sentencing Memorandum at 11-15.  Finally, counsel argued that Miller's personal characteristics warranted a lower sentence.   The attorneys discussed Miller's unstable childhood; how his father physically abused him; how Miller wanted to provide for his family and prove his worth to his father; how Miller was active in certain charities; and how Miller cooperated with the government after the FBI launched its investigation.   Miller's attorneys submitted 162 pages of documents supporting the

32

Sentencing Memorandum, including eight letters from friends and colleagues attesting to Miller's character.  <u>See</u> Crim. Doc. 55-16, Letters of Support.

Miller's team of lawyers continued their zealous advocacy at the sentencing hearing.  In addition to successfully objecting to the abuse-of-trust enhancement, counsel argued in favor of mitigating the loss amount attributable to Miller's fraud.  <u>See</u> Sentencing Tr. II at 21-24, 26.  Counsel argued that (1) the government had only identified and presented 23 of Miller's 50 victims, and (2) that Miller returned millions of dollars in fraudulently collected premiums, and therefore the true loss amount of Miller's fraud was between $6 million and $8 million, rather than $22.5 million.  Counsel also reiterated that Miller tried to cooperate with the government, <u>id.</u> at 27, 30; that he had a difficult childhood, <u>id.</u> at 18-20; and that Miller was generous to his community, <u>id.</u> at 30.

The record is replete with evidence that Miller's attorneys vigorously represented him at sentencing.  There is simply no support for the contention that Miller suffered from the ineffective assistance of counsel because of a conflict of interest, or that his attorneys abandoned him.  If Miller's attorneys did not make all of the arguments Miller wanted them to make, the record reflects that they had strategic concerns about how such arguments would compromise Miller's ability to obtain a lower sentence.  "Appx" 4 to Motion to Vacate ("As we have discussed, some of the position[s] you wish to take will undermine your ability to earn a departure under Rule 35"; "We discussed the fact that if we made many of the arguments that you and Joy advanced, that you would risk losing acceptance of responsibility points.").  Ultimately, counsel's valiant efforts to obtain a low sentence

simply could not overcome the overwhelming evidence that Miller executed a calculated and carefully planned fraudulent scheme, after years of participating in other fraudulent schemes.  The mere fact that a certain defense was unsuccessful does not prove that counsel was ineffective.  Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010).

The record further refutes each of Miller's specific allegations of ineffective assistance.

### a.  Failure to contest the loss amount

Contrary to Miller's allegation that his attorneys failed to contest the loss amount, counsel did argue that the Court should consider reducing the loss figure.  See Sentencing Tr. II at 21-24, 26; see also "Appx" 3, 4 to Motion to Vacate.  While counsel acknowledged that Miller admitted to collecting $22.5 million in fraudulent premiums, they argued that the actual loss amount was closer to $6 million to $8 million after refunds and payments that Miller disbursed.  What Miller fails to recognize, however, is that contesting the loss amount for Guidelines purposes could have jeopardized any credit Miller would receive for acceptance of responsibility under U.S.S.G. § 3E1.1, if not proving altogether meritless.   Counsel therefore did not perform unreasonably by not pursuing this line of defense further.

Application Note 3(E) to U.S.S.G. § 2B1.1 permits an offset to the loss amount for money returned to victims before the offense is detected.  Miller, though, has failed to show that he actually qualified for such an offset.  First, messages between Miller's lawyers and the prosecutor reflect that the government was prepared to contest a number

of Miller's alleged "refunds" as bogus, pointing to one particular example where Miller claimed to have issued a $400,000 refund, but the victim only received $62,000. "Appx 12" to Motion to Vacate. Thus, had Miller pursued a reduction of the loss amount, he would have risked tainting his credibility, and jeopardized a reduction of three offense levels for acceptance of responsibility. Credit for acceptance of responsibility requires "clearly" accepting responsibility, U.S.S.G. § 3E1.1(a), which would be put into question were Miller to advance specious arguments in support of loss mitigation. As reducing the loss amount from over $20 million to under $20 million would only result in a two-offense-level Guidelines reduction anyway, see U.S.S.G. § 2B1.1, Miller would simply have risked worsening his position by compromising a three-level-reduction for acceptance of responsibility to gain a two-level reduction for a lower loss amount.

Second, an offset under U.S.S.G. § 2B1.1 is permitted only if money or property is returned before the offense is detected, which is the earlier of (1) when the crime was discovered by a victim or government agency, or (2) when the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency. U.S.S.G. § 2B1.1, Application Note 3(E). Miller has provided no evidence that he refunded moneys or paid claims in the time required. Therefore, he has failed to show that he would actually have qualified for an offset of the loss amount.

Because Miller has failed to show that pursuing a reduction of the loss amount would have been meritorious, he cannot establish that counsel performed ineffectively at

sentencing by not expending greater effort to contest the loss amount.  See Lancaster v.

Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (a court may credit as professionally

reasonable counsel's decision not to raise what he reasonably believes to be a meritless

legal issue).

> **b. Failure to ensure that "factually accurate information was presented to the court"**

Similarly, Miller has failed to establish ineffective assistance based on his lawyers'

alleged failure to "take action to assure that factually accurate information was presented

to the court" at sentencing.  There appear to be two instances in which Miller alleges

counsel failed to ensure "accurate information" was presented to the Court: (1) the failure

to correct allegedly false testimony at the sentencing hearing from Fidelity National CEO

Mark Davey, Memorandum at 53, and (2) the failure to correctly detail Miller's legal history

with the Maryland Insurance Administration, id. at 54-56.  Both allegations are frivolous.

As to witness Mark Davey, Miller presents no evidentiary support for the assertion that

Davey committed perjury or spoke falsely at the sentencing hearing.[11]  Thus, it is not true

---

[11]     Davey testified that in 2007, Miller misled investigators into believing that he had a bona fide contract with Fidelity National to issue surety bonds in the company's name.  Sentencing Tr. I at 32-40. Davey remarked: "Mr. Miller was so confident and convincing to these investigators, these investigators returned to my office and attempted to tell me that I didn't know what I was talking about…Only a true criminal can sit across the desk from law enforcement officials and continue the fraud under these circumstances."  Id. at 36.  Miller thinks that Davey's account was proven false when the prosecutor allegedly said "… and it was only after we shut Mr. Miller down and took all of his records and all of his business equipment and all of his computers [in April 2008] that he decided to come and talk to the government."  Memorandum at 36.  Not only is the alleged quote from the prosecutor absent from the portion of the record Miller cites, but even as Miller phrases it, the statement does not mean Davey testified falsely, for Miller twists the meaning of "talk to the government."  By "talk to the government," the context clearly refers to cooperation, not that Miller literally never "talked" to an officer of the government before April 2008.  Moreover, the essence of Davey's testimony – that Miller brazenly lied to investigators about having a bona fide contract with Fidelity National – remains undisputed.  Thus, Miller's contention that the Court based his sentence on false testimony is untrue and meritless.

that counsel performed deficiently by failing to correct "false testimony."  As to Miller's

legal battle with the Maryland Insurance Administration, Miller himself points out that the

Court learned of his true history there through the Court's <u>sua</u> <u>sponte</u> efforts, and that the

status of the case was inconsistent with counsel's representations.[12]  Memorandum at

55.  However, Miller was not prejudiced by defense counsels' unfamiliarity with the legal

history of the Maryland Insurance Administration litigation.  The Court did not increase

Miller's sentence because his attorneys were not aware of the fact that the Maryland

Insurance Commissioner had entered a final order against Miller.  Unfortunately for Miller,

his true history with the Maryland Insurance Administration was entirely unfavorable to

him, and nothing counsel could have said would have changed that history.  Thus, even

if Miller's attorneys were inadequately prepared to discuss the Insurance Administration

litigation, it did not harm Miller or otherwise affect the outcome of the sentencing

proceeding.

### c.  Not advising Miller on withdrawing from the case

Miller's attorneys did not perform ineffectively by not advising Miller on his options

for having them withdraw from the case either, because there is no indication that Miller

directed them to do so, or that he wished to represent himself at sentencing.  At most,

---

[12]     Beginning at least as early as 2004, Miller was the subject of an investigation by the Maryland Insurance Administration for fraudulent insurance schemes he had carried out in that state.  In August 2007, the Maryland Insurance Administration issued a ruling against Miller.  In January 2008, the state court overseeing the Maryland Insurance Administration matter vacated the Insurance Administration's order and remanded the case.  Miller's counsel represented to the Court that the case "basically died" after that. Sentencing Tr. II at 5.  However, the Court discovered itself that in December 2008, the Insurance Administration reaffirmed its order finding that Miller had defrauded Maryland businesses, and that Miller had not appealed that final order.  <u>Id.</u> at 7.

Miller suggested in a single, intemperate email that his attorneys ought to withdraw <u>if</u> they couldn't "all agree on the right approach" to the sentencing hearing, which did not amount to a specific instruction to cease representing him.  <u>See</u> Appx. 2-4 to Motion to Vacate. Counsel responded by explaining that they did not think it wise to follow some of Miller's suggestions for litigating the case, and that nobody had misrepresented anything to him, as well as by assuring Miller that they would remain in contact.  <u>See</u> Appx. 4 to Motion to Vacate.  Shortly thereafter, Miller expressed his gratitude to three of his attorneys and his confidence in the "chemistry" developing among them.  <u>See</u> Appx. 5, 6 to Motion to Vacate.  Thus, the record refutes any contention that Miller's lawyers denied him the right to self-representation by ignoring a specific instruction to withdraw.[13]

### d.  Not objecting at sentencing to breaches of the Plea Agreement

Finally, Miller's team of lawyers did not perform deficiently by failing to raise alleged breaches of the Plea Agreement at the sentencing hearing.  As discussed below, the government did not do anything that was inconsistent with any promise actually contained in the Plea Agreement.  For that reason, arguments that the government breached the Plea Agreement would have proven meritless.  Accordingly, Miller's allegations that his lawyers rendered ineffective assistance at sentencing fails based on a record that thoroughly demonstrates his lawyers ardently and capably advocated for him.

---

[13]     What is more, the voluminous record of correspondence between Miller and his lawyers, and their professional representation after Miller intemperately suggested they should withdraw, contradicts Miller's previous claim that his attorneys were eager to "abandon" him because he could no longer afford to pay them.  <u>See</u> Memorandum at 52, 56-57; <u>see also</u> <u>supra</u> at 31-34.

**4.  Ground Four:  Failing to hire experts to investigate Miller's companies**

Miller contends that counsel gave ineffective assistance by failing to hire auditors and forensic accounting experts to investigate the financial circumstances of his companies.  Id. at 14-15.  The record refutes this claim.

The Supreme Court has described the standard applicable where a petitioner claims that counsel's inadequate investigation caused him to plead guilty:

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Hill, 474 U.S. at 59.  No absolute duty exists to investigate particular facts or a certain line of defense.    Rather, under Strickland, counsel need only conduct a reasonable investigation to fall within the wide range of competent assistance.  Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000).  Indeed, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.

Miller does not suggest what information a financial investigation would have yielded, except that it would have shown that his company allegedly had enough capital to cover claims made against the fake bonds.  Memorandum at 14-15.  However, counsel was aware of this line of argument – and did pursue it at sentencing.  (See Crim. Doc. 15, Miller's Sentencing Memorandum at 11-13).  Counsel argued, based on 2006 and 2007

reports prepared by an actuarial consulting firm, that Miller's company maintained capital to pay claims, and that hiring the actuarial firm and maintaining some capital cushion reflected a measure of scrupulousness on Miller's part that should mitigate his sentence. See id.; see also Sentencing Tr. II at 22, 33-34.   Counsel therefore did not neglect a financial investigation of Miller's companies, as Miller alleges.

Spending any more time investigating the financial ability of Miller's companies to pay claims would have been simply irrelevant.   The United States did not charge Miller with running an under-capitalized company, though even defense counsel conceded that Miller's operation would not have been considered properly collateralized by many regulatory standards.   Sentencing Tr. I at 18; see also Crim. Doc. 55, Sentencing Memorandum at 12.   Rather, Miller's fraud was in the act of taking money through deceptive misrepresentations about the reliability of the worthless paper he issued (regardless of whether or not he advertised that his own company was a T-listed surety bonder), which Miller calculated would induce people to entrust their money to him, and in using the facilities of interstate commerce to further the scheme.   See United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003) (discussing the elements of wire fraud); see also Pattern Crim. Jury Instr. 11th Cir. OI 50.1 (2010) (pattern jury instructions for mail fraud).   As a result of his fraud, many businesses lost contracts with state, local, and federal government agencies once it was discovered that their projects were not properly bonded, and still others failed to receive the coverage for which they paid many thousands of dollars.   Thus, the point of the investigation Miller thinks his attorneys should have

conducted, i.e. examining whether Miller's operation <u>could</u> <u>have</u> paid claims as ably as any other insurance company, is simply irrelevant to the elements of mail and wire fraud. Nor would any further financial investigation have aided Miller under the Sentencing Guidelines. There is no offense level reduction for running a fraudulent operation that had the <u>ability</u> to reimburse claims. What matters is that Miller <u>did</u> take millions of dollars in fraudulent premiums (after engaging in other fraudulent schemes for years before), and harmed his victims by doing so.

Because an attorney has no duty to undertake pointless and legally irrelevant investigations, Miller has not shown that his attorneys' investigation was unreasonable. The record reflects that Miller's counsel undertook a reasonable investigation of the financial circumstances of his fake-surety-bond operations in pursuit of mitigation at sentencing, although it was legally irrelevant to the ultimate question of guilt. Therefore, Miller has failed to show that additional financial investigation would have changed counsel's advice that Miller should plead guilty. <u>See</u> <u>Hill</u>, 474 U.S. at 59. Miller has also failed to show that further investigation into his scams' finances would have yielded any evidence or argument that might have reduced his sentence.

**B. Ground Five: The government's alleged breaches of the Plea Agreement**

Miller's primary contention in Ground Five is that the government breached his Plea Agreement. As Miller puts it, "[t]he government failed to keep promises made which induced Miller to plead guilty. These breaches rendered Millers' [sic] plea involuntary and

unknowing, as he would not have pled guilty had he known that the government had no intention of keeping the promises it made to Miller…"  Memorandum at 15.

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."  Santobello v. New York, 404 U.S. 257, 262 (1971).  The record here shows either that the alleged promises which Miller contends the government breached were not part of the Plea Agreement, or if they were that the government did not commit a breach.  The Court will address each in turn.[14]

### 1.  The family home

Pursuant to a handwritten modification of the Plea Agreement's asset forfeiture provision, the government agreed to allow Miller's wife to remain in the family home, not to force a sale of the home, and to negotiate with the wife for her to buy out the government's interest in the property.[15]  Plea Agreement at 6.  In a prematurely filed motion to vacate (Crim. Doc. 146, Motion to Vacate Guilty Plea), Miller contended that the government breached that provision of his Plea Agreement when his bank initiated foreclosure proceedings in late 2009.  Miller speculated that the government interfered

---

[14]     Miller correctly points out in his Reply that the Eleventh Circuit Court of Appeals did not address the breaches of the plea agreement that he currently alleges.  Reply at 16-19; Doc. 31-2, Sukhia Affidavit; see also Miller I, 432 F. App'x 952; Miller II, 432 F. App'x 955.  Thus, the claims are not procedurally barred as having already been resolved.  Miller is also correct that his alleged breaches were outside the appellate record, so they could not have been raised on direct appeal.  Indeed, this Court instructed Miller to raise the issues in a § 2255 motion.  Therefore, the Court will address the claims on the merits.

[15]     Miller and his wife, Bonnie Pauza-Miller, owned a house at 6917 Timber Creek Court, Clarksville, Maryland, as tenants by the entirety.  The home was listed as an asset subject to forfeiture in the Information, Miller's Plea Agreement, and the Judgment (Crim. Doc. 64, Judgment).

with a loan modification that he was seeking on the house, an allegation the government denied.  (Crim. Doc. 170, Government's Response to Wife's Notice of Claim and Legal Interest in Property at 2-3).  The Court dismissed Miller's Motion to Vacate Guilty Plea for lack of jurisdiction, and instructed Miller to raise the claim in a § 2255 motion.  (Crim. Doc. 178, Order at 2).  Miller thus raises that claim in the current § 2255 motion.  He also adds the contention that the government breached the Plea Agreement by failing to negotiate with his wife for the purchase of the government's interest in the family home. Memorandum at 16-19.

The record refutes Miller's contention that the government breached its agreement to not force a sale of the Miller family home.  First, as Miller himself has stated, it was the mortgagee-bank that initiated foreclosure proceedings on the family home, not the government.  See "Appx 32" to Motion to Vacate, November 18, 2009 letter to AUSA's Stoddard and Glober.  Miller's allegation that the bank instituted foreclosure proceedings because the government interfered with him obtaining a loan modification is bare, unsubstantiated speculation for which he provides no evidence.  Indeed, there is no indication that the government was responsible for, or played any role in, the initiation of the foreclosure proceedings.  Such speculative and conclusory allegations do not warrant an evidentiary hearing, much less any relief.  See Tejada, 941 F.2d at 1559.

Second, Miller points to no evidence showing that the government breached its agreement to negotiate with Miller's wife for her to purchase the government's interest in the home.  Although Miller contends that the government opposed his wife's attempts to

43

assert her claim of interest in the property, this claim is false.  In February 2009, the government sent Miller's wife a Notice of Forfeiture via certified mail, which advised her that to assert a claim or legal interest in any of the forfeited properties she must file a petition with the clerk of court for the Middle District of Florida within 30 days of receipt of the Notice.  See Crim. Doc. 211.  The return receipt reflects Miller received the Notice at the family home.  (See Crim. Doc. 211-1, Return Receipt).  However, Miller's wife did not submit a claim or attempt to contact the government.  (See Crim. Doc. 211-3, Government's Letter to Wife).  Over a year later, in March 2010, the government contacted Miller's wife a second time to initiate negotiations for the purchase of the government's interest in the home.  See id.  In April 2010, Miller's wife filed a much belated (and untimely) Notice of Claim and Legal Interest in Property (Crim. Doc. 167, Claim), which the government opposed as to most of the properties.  (Crim. Doc. 211).  However, despite the tardiness of the claim, the government specifically stated it did not oppose Miller's wife's claim of interest in the family home at 6917 Timber Creek Court, Clarksville, Maryland.  Id. at 11.

Although the United States conceded there may have been "a misunderstanding about which party would initiate such negotiations," it insists that

> the United States has taken no actions whatsoever with regard to [Miller's wife] being requested or required to move out of her home.  As a matter of fact, as soon as the United States learned a foreclosure action was pending, it informed the mortgage company that such an action was not permissible during the pendency of a forfeiture action.

Id. at 2-3.   Ultimately, the United States and Miller's wife agreed that the wife would consent to entry of a Final Judgment of Forfeiture on Miller's one-half interest in the property, after which the government would execute the proper documents to transfer the interest to Miller's wife, subject to a lien by Chase Home Finance.   (Crim. Doc. 243, Stipulation at ¶ 12).[16]   This Court's Final Judgment of Forfeiture as to Defendant's Interest in Real Property (Crim. Doc. 252) incorporated that agreement.   Id. at 4.   On or about June 27, 2011, the United States Marshals Service filed papers releasing the government's interest in the family home to Miller's wife (Crim. Doc. 257, U.S. Marshals 285 Form), consistent with Miller's Plea Agreement and the Court's Final Judgment of Forfeiture.   Miller's wife then sold the Timber Creek property in August 2011 and received the proceeds.   See Memorandum at 21.

The record establishes that the United States upheld its part of the bargain and transferred Miller's forfeited interest to his wife.   If foreclosure proceedings were initiated against Miller's home in late 2009, Miller has failed to show that it was precipitated by the government.   Moreover, the government contacted Miller's wife twice in order to prompt her to assert any legal interest she had in properties subject to forfeiture, and ultimately settled with her over the house.   Miller has not shown that the government breached the Plea Agreement with regard to the family home.

---

[16]   The forfeiture of the defendant's one-half interest to the government, followed by the government's transfer of that interest to the defendant's spouse, is the ordinary procedure followed where the government agrees to allow a defendant's spouse to maintain the defendant's forfeited interest in a property.  Here, the fact that the United States took the intermediate step of causing Miller to forfeit his one-half interest in the property prior to transferring that interest to Miller's wife does not mean that the government breached its part of the Plea Agreement with regard to the family home, only that it followed ordinary procedure before ceding that interest to Miller's wife.  See Response at 19-20.

### 2.  Miller's wife's Wachovia bank account

Miller contends that the government breached his Plea Agreement by failing to return to his wife all of the funds in a Wachovia bank account containing $51,272.07. Memorandum at 19-22.  Pursuant to a stipulation, the government returned $40,000 to Miller's wife, and Miller's wife consented to forfeiture of the remaining $11,272.07. Stipulation at ¶ 11.  That bank account was among the assets Miller agreed to forfeit pursuant to his Plea Agreement, and was included in the Court's Judgment.  Plea Agreement at ¶ A.10.v; Judgment at 9.  Despite this fact, the United States returned $40,000 to Miller's wife.  Nothing in the Plea Agreement required the government to do so.  Indeed it made no promise to return any part of those funds either in the Plea Agreement or at Miller's plea hearing.  And, Miller assured the Court under oath that he did not plead guilty based on any promises, agreements, or understandings other than those discussed on the record or in the Plea Agreement. Plea Tr. at 112-15.  Therefore, Miller has not shown that a promise to remit any portion of the Wachovia account proceeds to his wife was part of the inducement to plead guilty, or that the partial return of the funds constituted a breach of his Plea Agreement.

### 3.  Miller's Tax Refunds

Miller contends that the government breached an agreement to not pursue his tax refunds to satisfy his restitution or forfeiture obligations.   Memorandum at 22-25. Specifically, Miller contends he is due tax refunds of $32,987 and $138,659, that he has not received these refunds, and that the United States has taken these funds in breach

of his Plea Agreement.  This claim is without merit.  First, Miller's Plea Agreement only binds the United States Attorney's Office for the Middle District of Florida, and explicitly advises that it does not bind other agencies.  Plea Agreement at 14-15.  That the IRS – a distinct agency from the United States Attorney's Office for the Middle District of Florida – has not returned Miller's tax refunds does not ipso facto demonstrate a breach of the Plea Agreement by the United States Attorney's Office.  Second, no promise to allow Miller to keep his tax refunds appears in the Plea Agreement or on the record of his plea hearing, and Miller affirmed to the Court that he relied on no promises other than those so recorded.  Third, according to Miller's own emails, any discussion regarding tax refunds did not occur until May or June, 2009 (see "Appx 5" to Motion to Vacate), several months after he pled guilty.  Thus, such a promise could not have induced Miller to plead guilty, and if the government did breach a promise regarding tax refunds it would not be grounds to vacate Miller's guilty plea.  Accordingly, this claim lacks merit.[17] [18]

---

[17]    The forfeiture provision of Miller's Plea Agreement also contains a substitute assets clause, permitting the government to pursue any other assets worth up to the total value of the forfeited assets if the United States cannot locate or recover the forfeited properties.  Plea Agreement at 10-11.   Miller's forfeiture resulted in a personal money judgment of $22.5 million.  (Crim. Doc. 61, Personal Money Judgment).  At the latest count, Miller's forfeitures only covered $993,273.44, leaving an unpaid balance of a little more than $21 million. (Crim. Doc. 292, Notice of Partial Satisfaction of Personal Money Judgment). Thus, the United States would have the right to seize Miller's tax refunds as a substitute asset in order to satisfy his outstanding forfeiture and restitution obligations.

[18]    Miller cites In re Arnett, 804 F.2d 1200 (11th Cir. 1986), in support of the proposition that the government breached his Plea Agreement.  Memorandum at 61-62.  In Arnett, the Eleventh Circuit found that the United States breached a plea agreement where the prosecutor informed the defendant that the government only sought forfeiture of the $3,000 in cash found on the defendant's person at his arrest, and would not seek forfeiture of the defendant's farm in North Carolina.  Arnett, 804 F.2d at 1202.  The government's promise to not seek forfeiture of the defendant's North Carolina property was an important factor in the defendant's decision to plead guilty.  Id.  After the defendant pled guilty, the government sought forfeiture of the farm, and the Eleventh Circuit found that the government breached the defendant's plea agreement in doing so.

### 4.   Interference with the Upper Hudson Holdings-Robert Berman matter

Miller contends that the government promised to assist him in recovering money allegedly owed to him by a former business partner, Robert Berman, and Upper Hudson Holdings, LLC.   Memorandum at 25-26.   He claims that the government interfered with his right of recovery by sending an "intimidating" letter to the attorneys working on the lawsuit between Miller and Upper Hudson.   Id. at 26.   The United States Attorney's Office sent a letter in March of 2009 reminding the parties that pursuant to 18 U.S.C. § 2232[19], the United States sought to recover funds in Berman's possession that were derived from Miller's fraud.   See "Appx 54" to Motion to Vacate.   The government breached no promises or agreements by sending the letter.   No promise appears either in Miller's Plea Agreement or in the record of his plea hearing in which the United States promised to assist Miller in recovering funds from Berman or Upper Hudson.   Moreover, the United States' letter to the attorneys involved in the civil lawsuit between Miller and Upper

---

The instant case is distinguishable from Arnett.   First, the government in Arnett breached the plea agreement because it sought to increase the total amount of the defendant's forfeiture by pursuing his farm after he had already forfeited the agreed-upon $3,000.   Here, it would not increase the total amount of Miller's forfeiture for the government to seize Miller's tax refunds – or any other asset – because he still has an unpaid balance of over $21 million in forfeitures.   Second, the government in Arnett sought forfeiture of a property that was uniquely special to the defendant, and the defendant specially relied on the government's promise not to seek forfeiture of his farm in deciding to plead guilty.   Here, there is no indication that Miller's tax refund or any other asset (other than the Timber Creek Court property) was of unique value to Miller such that he pled guilty in special reliance on the belief that the asset would not be forfeited.

[19]   "Whoever, before, during, or after any search for or seizure of property by any person authorized to make such search or seizure, knowingly destroys, damages, wastes, disposes of, transfers, or otherwise takes any action, or knowingly attempts to destroy, damage, waste, dispose of, transfer, or otherwise take any action, for the purpose of preventing or impairing the Government's lawful authority to take such property into its custody or control or to continue holding such property under its lawful custody and control, shall be fined under this title or imprisoned not more than 5 years, or both."   18 U.S.C. § 2232(a).

Hudson was consistent with the United States' right to pursue substitute assets in satisfaction of his forfeiture and restitution obligations reflected in the Plea Agreement. Therefore, Miller has not shown how the United States breached his Plea Agreement by communicating its intent to the attorneys involved in the civil litigation between Miller and Upper Hudson Holdings, LLC.

### 5. Failure to recommend sentence reduction in exchange for grand jury testimony

Sometime in early 2009 – after having already pled guilty – Miller agreed to provide grand jury testimony for the United States Attorney's Office for the Northern District of New York, which was investigating certain individuals in Syracuse, New York for public corruption.  Memorandum at 29-30.  In exchange for his grand jury testimony, the United States Attorney's Office for the Northern District of New York agreed "to make a strong recommendation to the AUSA in Florida (Stoddard), that Miller be given consideration for the filing of a motion for sentence reduction…"  Id. at 29.  Miller also claims that this agreement was made with the "blessing" of the United States Attorney's Office for the Middle District of Florida, thereby making that office a party to the agreement.  Motion to Vacate at 18.  Miller alleges that the United States Attorney's Office for the Northern District of New York never made the sentencing recommendation, and thus, both offices breached his Plea Agreement.  Id.

The critical flaw in Miller's argument is that any agreement with the United States Attorney's Office in New York to recommend a motion for a reduced sentence came after he pled guilty, and therefore it could not have induced Miller to plead guilty in the first

place.  Thus, Miller cannot rely on this ground to vacate his guilty plea.  Additionally, Miller pled guilty based on an agreement between himself and the United States Attorney's Office for the Middle District of Florida.  If Miller had another agreement with another prosecuting agency, and that prosecuting agency breached that agreement, it would not be grounds for Miller to rescind the Plea Agreement he made with the Middle District of Florida office.

Miller also is not entitled to compel the United States Attorney's Office, either for the Northern District of New York or for the Middle District of Florida, to file a Rule 35 motion for a reduced sentence.  Whether the government should move to reduce a defendant's sentence pursuant to Fed. R. Crim. P. 35(b) is a matter of discretion, for "Rule 35 imposes no duty upon the government to so move."  United States v. Turner, 183 F. App'x 877, 878 (11th Cir. 2006) (citing Wade v. United States, 504 U.S. 181 (1992)).  A district court may only review a prosecutor's decision to refuse a Rule 35 motion where the refusal was based on an unconstitutional motive, such as the defendant's race or religion.  See Wade, 504 U.S. at 185-86.  Miller has alleged no such motive as the reason why a Rule 35 motion has not been filed, and no unconstitutional motive is apparent.  Accordingly, the Court lacks authority to review the United States Attorney's Office's refusal to file a Rule 35 motion on Miller's behalf.

### 6. The government has not given Miller credit toward his forfeiture and restitution obligations for seizures and asset sales

At the time Miller filed his Motion to Vacate, the government had not yet filed a total account of assets seized from Miller and the revenues derived from their liquidation.  As

50

such, Miller contends that the government breached the Plea Agreement by not giving Miller credit toward his forfeiture and restitution obligations for the sale of seized assets. This complaint has subsequently been rendered moot.  On February 24, 2014, the United States filed a Notice of Partial Satisfaction of Personal Money Judgment (Crim. Doc. 292), reflecting assets seized and how much credit applied to Miller's personal money judgment from each asset.  The Notice indicates that Miller's money judgment has been satisfied to the extent of $993,273.44 based on the seizure and liquidation of 18 assets, with an outstanding balance of $21,506,726.56.  Id.  Miller has pointed to no evidence that the Notice is inaccurate or that the government has obtained any other assets for which he has not been given credit.  Rather, the record shows that the United States has been crediting Miller's obligations for the assets sold.[20]  Thus, this claim fails.

### 7. The government promised that Maryland authorities would not prosecute Miller if he pled guilty

Next, Miller claims that the United States told Miller that it was in communication with Maryland authorities, and relayed to him that Maryland would not prosecute Miller "for any matters rising from the administrative case that Miller was fighting with the Maryland Insurance Administration" if he pled guilty to federal criminal charges. Memorandum at 32-34.  The State of Maryland subsequently indicted Miller in January,

---

[20]     Even if the government had not been applying sales to Miller's forfeiture or restitution obligations, the appropriate remedy would be to order the government to provide an accounting and to credit Miller's unpaid balance accordingly.  Vacatur of Miller's guilty plea would be an unwarranted and extreme remedy.

2011, and Miller pled guilty to a single misdemeanor.[21]  Id. at 33.  Miller thus contends that the United States breached the Plea Agreement when Maryland indicted him.

A few provisions of Miller's Plea Agreement are relevant in evaluating this allegation.  First, the United States agreed not to prosecute Miller for any other <u>federal</u> offenses of which it had knowledge at the time Miller pled guilty.  Plea Agreement at 3.  The Plea Agreement was silent on Miller's liability for state criminal charges.  Second, Miller's Plea Agreement affirmatively stated that it would bind only the United States Attorney's Office for the Middle District of Florida, and "cannot bind other federal, <u>state</u>, or local prosecuting authorities…"  Id. at 14 (emphasis added).  Notably, neither the Plea Agreement nor Miller's plea hearing reflect any promise on the part of the United States that no other state or local authority would prosecute Miller for conduct related (or unrelated) to his federal charges.  Miller's Plea Agreement also stated that there were no promises or understandings outside of the written Plea Agreement, id. at 16, and Miller affirmed as much to the Court under oath.  Plea Tr. at 112-15.  The foregoing reflects that the United States made no commitment that the State of Maryland would not bring criminal charges against Miller, nor did Miller rely on any such assurance in pleading guilty.  Because Miller has failed to show that the United States made the promise he alleges it broke, he has failed to show a breach of his Plea Agreement.

---

[21]     Miller fails to identify the offense charged in the State of Maryland.  The indictment could have been for any myriad of offenses not related to the charges before the Court, which would not be a breach of the Plea Agreement.

### C. Grounds Six and Seven:   Alleged fraud on the Court and conflict of interest within the United States Attorney's Office

Miller alleges in Ground Six that the United States committed fraud on the Court by (1) presenting false testimony from Fidelity National CEO Mark Davey at his sentencing hearing, and (2) misrepresenting during restitution proceedings that all matters of restitution had been resolved.[22]   Memorandum at 35-39.   In Ground Seven, Miller alleges that there was an undisclosed conflict of interest within the United States Attorney's Office because the former United States Attorney for the Middle District of Florida had obtained employment with Fidelity National, one of the victims of Miller's fraud.   Miller further alleges that the prosecutor in his case had an inappropriate lunch meeting with that former United States Attorney where the two discussed his case.[23]

---

[22]     Miller does not have standing to vacate his conviction or sentence based upon the government's incorrect representation in a restitution stipulation that all restitution matters had been resolved.   See Crim. Doc. 102, Petition to Intervene by Hansen Information Technologies; Crim. Doc. 131, Restitution Tr. at 5-11.   Although the government inaccurately represented that it had resolved all restitution matters despite leaving out a victim, Hansen Information Technologies, such a misrepresentation would only have benefited Miller by reducing his restitution liability.   Miller has utterly failed to show how such a misrepresentation would have injured him.

[23]     Miller specifically alleges that the lunch meeting was a violation of 18 U.S.C. § 207, which restricts former employees of the federal government from communicating with or appearing before the courts or other federal agencies in connection with any matter in which that ex-employee was personally and substantially involved, or which was pending under the ex-employee's official responsibility during a one- or two-year period preceding the ex-employee's departure from the federal government.   In particular, § 207 requires that for such a communication or appearance to be illegal, it must be made "with the intent to influence" the outcome of a matter.
     There is no indication that the ex-United States Attorney ever communicated with a member of the federal government "with the intent to influence" any aspect of Miller's case, so a claim of a § 207 violation is unsubstantiated at the outset.   Moreover, § 207 by its terms regulates only individuals who are former employees of the federal government, not the government itself.   If a § 207 violation occurs at all, by definition it is committed by an ex-employee and not by the government.   Put another way, a violation of 18 U.S.C. § 207 creates a criminal cause of action by the United States against a former employee, not a cause of action by a third-party convict (such as Miller) against the government.   Therefore, a § 207 violation by a private citizen would not establish wrongdoing by the government that would warrant habeas relief. Thus, even if the ex-United States Attorney had violated § 207, that does not establish that the government violated Miller's rights.

Essentially, Miller alleges that the government violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), by failing to disclose what he thinks was impeachment evidence and false testimony.

To the extent Miller raises these two grounds as an attempt to challenge his sentence, they are barred by a valid waiver of collateral review.  Indeed, Miller raised a similar issue on direct appeal when he argued that his sentence was erroneously influenced by false testimony from another one of his victims, the CEO of a construction company. <u>See</u> <u>Miller II</u>, 432 F. App'x at 958.  The Eleventh Circuit held that the claim was barred by a valid sentence-appeal waiver.  <u>Id.</u> at 960.  In the same way, Miller's claims alleging fraud on the Court and a conflict of interest within the prosecutor's office are barred by his collateral review waiver insofar as he raises them to challenge the length of his sentence.

To the extent Miller raises these two grounds to challenge the validity of his guilty plea itself, he has failed to show how either one rendered his plea unknowing or involuntary.  To be valid, a guilty plea must be (1) made free from coercion (2) by a defendant who understood the nature of the charges and (3) the consequences of his guilty plea.  <u>Mosley</u>, 173 F.3d at 1322.  The factual allegations in Ground Six are based on the government's conduct at Miller's sentencing and restitution hearings, and therefore could not have influenced his decision to plead guilty.  Thus, nothing in Ground Six

provides reason to doubt the validity of Miller's guilty plea or Plea Agreement.[24]   Nor has

Miller shown any nexus between the "conflict of interest" alleged in Ground Seven and

how that undermines the free and intelligent nature of his guilty plea.   As discussed at

length earlier in this opinion, Miller pled guilty knowingly and voluntarily.   He has failed to

show how the fact that the former United States Attorney had become employed by one

of the companies he defrauded rendered his decision to plead guilty an unknowing or

involuntary act.   Miller's factual guilt has been established by his voluntary admission of

the truth of the factual basis and the charges against him.   Accordingly, Miller's claims for

relief in Grounds Six and Seven fail to support vacatur of his guilty plea.[25]

### D.  Ground Eight:  Jurisdiction

Finally, Miller contends that the Court lacked subject matter jurisdiction to convict

and sentence him for violations of the federal mail and wire fraud statutes, 18 U.S.C. §§

1341 and 1343, respectively.

---

[24]     Notably, the misrepresentations made by the government to the Court actually benefited Miller, as the prosecutor was leaving out a victim for purposes of restitution because Miller objected to the claim and it was unclear to the prosecutor whether the victim's claim had merit.  Restitution Tr. at 5-12, 14-23, 31-41.

[25]     Miller, as a matter of course, adds in Grounds Six and Seven that counsel also rendered ineffective assistance by failing to object to fraud on the Court and the alleged conflict of interest.  To the extent Miller complains that counsel failed to object to inaccurate statements at his sentencing hearing, the Court has already concluded in Ground Three that counsel did not perform deficiently at sentencing, and that no evidence exists that any witness committed perjury at the hearing.  To the extent Miller complains that counsel performed deficiently in his restitution hearing, such a claim is not cognizable in a motion to vacate under 28 U.S.C. § 2255, as collateral relief does not provide relief from a monetary judgment.  Mamone v. United States, 559 F.3d 1209, 1211 (11th Cir. 2009).  Finally, to the extent Miller complains counsel gave ineffective assistance by not objecting to the alleged conflict of interest between the prosecution and one of the victims, he has failed to show how such a failure either affected his sentence or rendered his guilty plea unknowing or involuntary.

### 1.  Reverse Preemption

Miller argues that "[t]he federal government has no jurisdiction to prosecute matters that pertain to a violation of any insurance law of a state or commonwealth of the United States."  Memorandum at 42.  Because Miller's fraud exclusively involved selling fake surety bonds, he believes his conduct should be regulated only by state insurance laws.  Although Miller does not refer to the statute, his jurisdictional argument apparently relies on the McCarran-Ferguson Act, codified at 15 U.S.C. §§ 1011-1015.[26]   The law provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance…"  15 U.S.C. § 1012(b).  The consequence of McCarran-Ferguson, whereby state insurance laws supersede incompatible federal laws that were not specifically designed to regulate insurance, has become known as "reverse preemption."  See Blackfeet Nat'l Bank v. Nelson, 171 F.3d 1237, 1248 (11th Cir. 1999).

Reverse preemption is unavailing to Miller.  The McCarran-Ferguson Act does not completely "cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."  Humana Inc. v. Forsyth, 525 U.S. 299, 308 (1999).  As the Supreme Court explained, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-

---

[26]     Recognizing that Miller is a pro se litigant, the Court has tried to liberally construe his petition.  See Diaz v. United States, 930 F.2d 832, 834 (11th Cir. 1991).

Ferguson Act does not preclude its application."   Id. at 310 (emphasis added).   In Humana, the Court upheld a private federal RICO action in the face of a McCarran-Ferguson challenge where the plaintiff sued an insurer for treble damages for corrupt practices, even though state law provided for a similar remedy.   The Supreme Court noted that "RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief," and reasoned that "[b]ecause RICO advances the State's interest in combating insurance fraud, and does not frustrate any articulated Nevada policy," McCarran-Ferguson did not bar the RICO suit.   Id. at 313-14.

Just as private RICO actions complement state insurance regulatory schemes, so too do federal laws criminalizing mail and wire fraud.   States have a strong interest in preventing fraud, and nothing about 18 U.S.C. §§ 1341 or 1343 conflicts with, impairs, or frustrates the ability of the States to regulate the business of insurance.   Indeed, the prosecution of those who commit fraud by wire or mail, even in connection with insurance, complements and promotes the interest of the States in protecting the integrity of their insurance markets.   Other courts have reached the same conclusion.   See e.g., United States v. Blumeyer, 114 F.3d 758, 768 (8th Cir. 1997) (McCarran-Ferguson Act does not preempt prosecution for mail and wire fraud in connection with insurance fraud); United States v. Cavin, 39 F.3d 1299, 1305 (5th Cir. 1994) (no conflict between federal charges for conspiracy to defraud and state insurance regulatory scheme); United States v. Sylvanus, 192 F.2d 96, 100 (7th Cir. 1951), cert. denied 342 U.S. 943 (1952) (McCarran-

Ferguson Act did not preclude federal prosecution of president of insurance company for mail fraud).  Thus, Miller's "reverse preemption" challenge to his federal convictions for mail and wire fraud lack merit.[27]

### 2.  Defective information

Miller contends that the Court lacked jurisdiction to preside over his conviction and sentence because the "Criminal Information and Factual Basis contained structural defects which failed to meet the elements, as required under the wire fraud statute, and the government knowingly misrepresented this fact to the court, and to Miller's counsel." Memorandum at 43.  The Information and the factual basis of Miller's Plea Agreement stated that Miller committed wire fraud by directing one of his attorneys, C. Allan Reeve[28], to place a phone call to Fidelity National's CEO, whereby he falsely represented through a phone conversation that a fictional employee of Fidelity National had authorized Miller to issue surety bonds in the company's name.  See Plea Agreement at 22.  The purpose of the phone call and misrepresentation, according to the government, was to "lull" Fidelity National into not initiating an investigation against Miller, all in furtherance of Miller's scheme to defraud.  Miller claims he has now discovered that there never was a phone

---

[27]     The Court adds that Miller could have brought this claim on appeal, but failed to do so.  Such claims are considered procedurally defaulted, and may not be raised for the first time in a § 2255 motion.  Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir. 2004).  The Court considered the claim because Miller tied it to the Court's subject matter jurisdiction, and challenges to a court's subject-matter jurisdiction cannot be waived or defaulted.  Cotton, 535 U.S. at 630.  However, a number of courts have also held that the McCarran-Ferguson Act does not create jurisdictional limits.  Blumeyer, 114 F.3d at 768; United States v. Robertson, 158 F.3d 1370, 1371 n.1 (9th Cir. 1998); Cavin, 39 F.3d at 1305.  Therefore, if McCarran-Ferguson is not jurisdictional, then Miller's reverse preemption claim not only lacks merit, but it also does not survive procedural default.

[28]     Reeve himself is not accused of any wrongdoing.

"conversation" between his attorney and Fidelity's CEO, but only that his attorney made the statement (which Miller directed him to make) in a voicemail.  Memorandum at 44. Therefore, Miller's contention boils down to the argument that the wire fraud statute would not apply to a voicemail as opposed to a person-to-person telephone conversation.[29] Memorandum at 44 ("A voice mail message does not satisfy the essential elements or the jurisdictional requirements necessary to sustain a wire fraud violation.").   This contention is frivolous.

The federal wire fraud statute makes it a crime for anyone to transmit or cause to be transmitted "by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds" for the purpose of executing a scheme or artifice to defraud.  18 U.S.C. § 1343.  A voicemail left by phone is as much a "signal" or "sound" sent by "wire, radio, or television communication" as a person-to-person telephone conversation.   Thus, the fact that Miller's attorney left a "lulling" voicemail for Fidelity's CEO, rather than having a person-to-person telephone conversation, in no way lessens the applicability of the federal wire fraud statute. Accordingly, Miller's jurisdictional challenge fails.

   **3.  Whether the Court erred in calculating the Guidelines loss amount based on conduct over which the Court would lack jurisdiction**

---

[29]      Miller does not contest Congress' constitutional power to criminalize wire fraud, nor could he. "Telephones and cellular telephones are instrumentalities of interstate commerce," which Congress has the authority to regulate pursuant to the Commerce Clause.  United States v. Evans, 476 F.3d 1176, 1180 (11th Cir. 2007).

After pleading guilty and admitting to the Court that he committed fraud, Miller now claims that "[t]he court was without proper jurisdiction to punish Miller for what amount to possible violations of state insurance regulations." Motion to Vacate at 27; see also Appx 61 to Motion to Vacate. In his argument, Miller does not dispute that he committed fraud to the extent that he misrepresented that some surety bonds were underwritten by T-listed companies. Nevertheless, Miller argues that the Court had no jurisdiction to consider in sentencing him the fact that he also issued bonds in the name of AMS Capital Holdings, a North Carolina corporation, where he did not purport them to be authorized by T-listed companies. Specifically, Miller contends that the government was wrong to characterize AMS's surety scheme as being fraudulent because it was unlicensed, explaining that until 2008, North Carolina law did not require surety bonders to be licensed by the Department of Insurance. Motion to Vacate at 27; see also "Appx 61" to Motion to Vacate. Thus, Miller contends there was nothing fraudulent about AMS issuing surety bonds to contractors without an insurance license.

Miller previously challenged the Court's calculation of the loss amount on direct appeal. There, the Eleventh Circuit rejected Miller's loss amount challenge as barred by a valid sentence-appeal waiver. Miller II, 432 F. App'x at 960. "It is long settled that a prisoner is procedurally barred from raising arguments in a motion to vacate his sentence… that he already raised and that we rejected in his direct appeal." Stoufflet v. United States, 757 F.3d 1236, 1239 (11th Cir. 2014) (internal citation omitted). Therefore, Miller's second attempt to challenge the Guidelines loss amount is not only barred by a

valid sentence-appeal waiver, it is procedurally barred as having already been raised and rejected on direct appeal.

Recasting his challenge to the loss amount as jurisdictional is unavailing. "[I]n calculating the amount of loss, the Guidelines require a district court to take into account "not merely the charged conduct, but rather all 'relevant conduct,' in calculating a defendant's offense level." United States v. Foley, 508 F.3d 627, 633 (11th Cir. 2007) (quoting United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006)). "'[S]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence.'" Hamaker, 455 F.3d at 1336 (quoting United States v. Hasson, 333 F.3d 1264, 1279 n. 19 (11th Cir. 2003)); see also United States v. Behr, 93 F.3d 764, 765-66 (11th Cir.1996) (even conduct that took place outside a relevant statute of limitations period may be factored into the loss calculation for sentencing purposes). Indeed, "relevant conduct" for purposes of the Sentencing Guidelines includes conduct over which a federal court would not have jurisdiction to convict the defendant. United States v. Speelman, 431 F.3d 1226, 1232 (9th Cir. 2005) (collecting cases); 18 U.S.C. § 3661 (providing that courts at sentencing must be able to consider without limitation all information about defendants' "background, character, and conduct"); see also U.S.S.G. § 1B1.3(a)(1)(A) (instructing the courts, in applying the Guidelines, to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."). Thus, even assuming the truth of Miller's argument that the district court would have lacked jurisdiction to convict him for fraudulent conduct

61

to the extent he issued surety bonds in North Carolina, the Court was authorized to consider that conduct and include it in the loss amount as relevant conduct.[30]

Moreover, Miller's activities through AMS, even when he did not purport the company to be authorized to issue sureties for T-listed companies, was without question "relevant."  Miller's argument that North Carolina law did not require surety bonders to be licensed by the Department of Insurance until 2008 is a red herring, as it does not change the fraudulent nature of AMS's operations.  Even in those instances where Miller did not misrepresent that his company was T-listed, he nevertheless induced his victims to believe his company provided reliable bonds by misrepresenting that he was a permitted surety bonder under the Federal Acquisition Rules.[31]  See "Appx 63" to Motion to Vacate. Additionally, Miller marketed his surety bonds to contractors.  Even if North Carolina law did not categorically require surety bonders to be licensed by the Department of Insurance until 2008, North Carolina law did establish standards for surety bonds tendered by contractors.  Surety bonds tendered by contractors had to be issued by "a surety

---

[30]    The Court notes that Congress' authority to punish fraudulent conduct perpetrated by mail and wire derives from its authority to regulate the use of the facilities of interstate commerce, irrespective of whether the fraudulent scheme itself would contravene state law.  United States v. Mandel, 591 F.2d 1347, 1358-59 (4th Cir.) on reh'g, 602 F.2d 653 (4th Cir. 1979) (vacating on other grounds).  Miller's premise, that the Court would not have jurisdiction to sentence him for mail and wire fraud because AMS Capital Holdings was not required to be a licensed insurer under North Carolina law, is itself flawed.

[31]    This representation too was deceptive.  Strictly speaking, the Federal Acquisition Rules ("F.A.R.") do not authorize surety bonders.  F.A.R. Sections 28.203, 28.203-1, and 28.203-2 require that for an individual surety to be acceptable, the individual surety must pledge a security interest in approved assets. Acceptable assets include unencumbered real property, irrevocable letters of credit issued by a federally insured financial institution, stocks traded on a national U.S. stock exchange, or cash.  F.A.R. § 28.203-2(b).  Miller has never contended that he securitized his surety bonds as required by F.A.R.  Thus, even as to bonds for which he did not misrepresent a link to T-listed companies, he misrepresented the integrity of the surety bonds by implying they met the standards established by F.A.R.

authorized to transact surety business in North Carolina pursuant to G.S. 58 Articles 7, 16, 21, or 22," and the surety had to "maintain a rating from A.M. Best, or its successor rating organization, of either Superior (A++ or A+) or Excellent (A or A-)." 21 N.C. Admin. Code 12.0204.  Miller represented to contractors that his surety bonds were valid for their projects, but the bonds did not meet the requirements set forth under the North Carolina Administrative Code.  As a consequence, contractors who received bonds through AMS received notifications that their surety bonds were no good.  See e.g., Restitution Tr. at 112.  Thus, Miller's conduct through AMS was still relevant fraudulent conduct appropriate for the Court's consideration in calculating the loss amount.

Having reviewed all of Miller's claims of error, the Court has found each to be barred or to lack merit.  The magnitude of Miller's fraud and the evidence against him were both substantial.  Miller was represented by four capable attorneys, and he decided to plead guilty following an exhaustively thorough Rule 11 plea colloquy.  Miller has not demonstrated that the government broke any promises that were part of the inducement to plead guilty, nor do any of his remaining claims of error justify vacating a knowing and voluntary guilty plea.   Miller's Motion to Vacate is therefore due to be denied and judgment is due to be entered in favor of the government.[32]

---

[32]    Miller has also filed two pro se motions for summary judgment (Docs. 33, 61).  For the same reasons discussed in determining that judgment is due to be entered in favor of the government, Miller's motions for summary judgment are due to be denied as well.

**IV.      Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)**

If Miller seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (c)(2). To make this substantial showing, Miller "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

As such, and in accordance with the Rules Governing Section 2255 Cases in the United States District Courts, it is hereby

64

**ORDERED:**

1.   Petitioner William Raymond Miller, II's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 1, Motion to Vacate) is **DENIED**.  Petitioner William Raymond Miller, II's <u>Pro Se</u> Motions for Summary Judgment (Docs. 33 and 61), Motion for Evidentiary Hearing (Doc. 62) and Motion for Discovery (Doc. 63) are **DENIED AS MOOT**.

2.  The Clerk shall enter judgment in favor of the United States and against William Raymond Miller, II.

3.  The Clerk shall further terminate all pending motions and close the file.

4.   If Miller appeals the denial of the petition, the Court denies a certificate of appealability.  Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of January, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc 19
Copies:

Counsel of record
Pro se party

65